IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**F I L E D**

JAN 1 2 2006

VANESSA L. SLIGER SNODGRASS,
        Plaintiff,

v.
                                 Civil Action No. 1:04-CV-228
                                 (Broadwater)

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,
        Defendant.

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Vanessa L. Sliger Snodgrass ("Plaintiff") filed applications for DIB and SSI in February, 2001, alleging disability beginning January 3, 2001, due to post traumatic stress disorder and migraine headaches (R. 50, 59, 71). Both applications were denied initially and on reconsideration (R.41, 724). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Steven D. Slahta held on August 8, 2002 (R. 734). Plaintiff, represented by counsel, testified, as did Vocational Expert Larry Bell ("VE"). On December 5, 2002, the ALJ issued an unfavorable decision (R. 27). Plaintiff requested review (R. 11). On August 18, 2004, the Appeals Council denied Plaintiff's request for review (R. 5), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Vanessa L. Sliger Snodgrass ("Plaintiff") was born on April 11, 1973, and was 29 years old at the time of the administrative hearing (R. 59). She graduated from high school and has past relevant work experience as a cashier and department manager in a grocery store and convenience store (R. 737). Plaintiff alleges her impairments first bothered her in November 1997, and caused her to stop working in January 2001 (R. 71).

On December 22, 1998, Plaintiff presented to West Virginia University Behavioral Medicine and Psychiatry Department for a chief complaint of headaches (R. 169). She saw Ronald McFadden, M.D., a resident, supervised by psychiatrist Dianne Trumbull, M.D. Plaintiff reported the headaches started five years earlier, at age 20. They seemed to be precipitated by stress and peri-menstrual. They were characterized by syncope, emesis, diarrhea, and upset stomach. They may last several days, and at times have lasted for a month. Extensive neurological workups including CT, MRI, and spinal tap were all unremarkable. She said she had been tried on different medications including Imitrex[1] and other non-narcotic migraine medications. She reported she was able to get relief with Nubain and Phenergan. Dr. Azzouz, a neurologist, prescribed Depakote which "helped some." Her treating physician prescribed Prozac, which Plaintiff said helped stabilize her mood and reduce the frequency and intensity of the headaches. She stated that her mood remained quite low at times and her anxiety high despite medication.

Plaintiff reported that one day before her 16th birthday, an acquaintance showed up at her house to wish her a happy birthday (R. 169). They drove to a lake. He was drinking and told her

---

[1]Imitrex is a selective serotonin receptor agonist used in the acute treatment of migraine and cluster headaches. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1792 (30th ed. 2003).

he was going to rape her. They then went to his friend's house where he raped her in the bedroom on the waterbed. The perpetrator told her that if she ever talked about it he would kill her. The friend, who was also there but did not rape her, also threatened to kill her. She told her parents and the prosecuting attorney of the rape. The prosecuting attorney reportedly advised her it would be a difficult trial and she "would be placed on public display." Her father, a county deputy sheriff, urged her not to press charges and she did not. *She also reported trauma as a child, because her family was "frequently being threatened" due to her father being a deputy. She stated that the family had to move to a "safe house" several times. She also reported that on another occasion, a sheriff believed her father was an FBI informant and she believed he was going to kill them.* She said her father had frequent affairs, and, on one occasion, hit her mother when his girlfriend came to visit. All these memories came back when she was under stress.

Plaintiff had two sons, one age five and one age three (R. 170). The father of the three year old was her present boyfriend. *They had been together for four years. Plaintiff told Dr. McFadden she and her boyfriend were separating, however, and she would be moving in with her ex-mother-in-law, because "the headaches are essentially too much for her current boyfriend to bear."* (Emphasis added). She denied any family history of mental or physical illness. Physical examination was normal. On mental status exam, Plaintiff was alert and fully oriented. She was pleasant and cooperative. She established some eye contact but generally averted her gaze to one side. She denied current suicidal or homicidal ideation. *She told the psychiatrist she was "quite angry" with the rapist because she saw him occasionally in the grocery store where she worked, but did not feel homicidal toward him.* The psychiatrist found her thoughts were organized and goal directed. She indicated she was feeling quite anxious during the interview and reported several

3

somatic symptoms such as a lump in her throat, palpitations, a tight feeling in her head, and generalized weakness. She denied ever experiencing visual or auditory hallucinations. She could perform serial sevens.

Plaintiff was diagnosed with chronic PTSD and rule out major depressive disorder. Her GAF was determined to be 50 (R. 170).

On August 24, 1999, Plaintiff presented to Srinivas Yemeni, M.D., as a new patient (R. 103). She reported a history of post-traumatic stress disorder ("PTSD") and migraines. She had been seen on an outpatient basis a year and a half earlier, at which time she was referred to the Post-Traumatic Stress Disorder Clinic, but had had no health insurance and could not afford treatment at the time.

Plaintiff reported to Dr. Yemeni that she had been raped by an acquaintance at age 15, who threatened to kill her if she told anyone (R. 103). She had told her father, a deputy sheriff, but he told her not to press charges, and her mother left the decision to her, so she did not press charges. She married at age 18 and divorced at age 21. Since her divorce she suffered headaches and over the last couple of years had flashbacks and dreams of the rape. She had been in a steady relationship for the past five years, however. Over the last couple of weeks her symptoms had worsened with increasing frequency of the headaches, trouble with concentration, occasional shortness of breath, and difficulty functioning at work. Although she had been admitted to the inpatient psychiatry unit at Fairmont General Hospital for a suicide attempt with an overdose of prescription medication in 1998, she denied any suicidal or homicidal ideation currently. She reported currently taking Prozac.

Upon examination, the doctor noted Plaintiff had occasional crying spells during the interview, her speech had good tone, rate, and rhythm, her mood was sad, her affect was congruent, her thought processes and content were within normal limits without any delusion, and she denied

4

hallucinations or suicidal or homicidal ideation (R. 104.) She reported a decrease in concentration, appetite, and interest in activities. She had trouble sleeping. Physical examination was normal. The doctor assessed Plaintiff with PTSD, chronic, and migraines (R. 105). She noted *her stressors included that the rapist was still in the area, and that she was having trouble with her current long-term (5 -year) relationship, as her long-time boyfriend did not wish to get married, and she had two young sons.* Dr. Yemeni found Plaintiff's GAF to be 61 currently, with a low of 51 in the past.

Plaintiff was evaluated by psychiatrist Louis Tinnin, M.D. for PTSD in September 1999 (R. 186). Plaintiff reported being tortured and raped at age 16 by an acquaintance. She reported flashbacks, body memories, recurrent images and thoughts, and psychological distress with reminders of trauma. Her reported symptoms were diminished interest in activities, feeling detached and estranged from others, efforts to avoid thinking about the trauma, sense of foreshortened future, exaggerated startle response, irritability, difficulty concentrating, hypervigilance, and outbursts of anger. She had partial amnesia around the rape event. She had a suicide attempt in February 1997 when she overdosed on Klonopin. She had a history of migraine headaches. She *reported being in a long term relationship with a boyfriend*, with whom she had a four-year old son. She also had a six-year old son by an earlier marriage that had ended in divorce. She indicated she was an only child and *she "felt safe as a kid because [her] father was the Deputy Sheriff in our town."* (Emphasis added).

Upon mental health examination, it was noted Plaintiff was poorly groomed, appeared anxious, and had difficulty sustaining eye contact. Her voice trembled and she became tearful as she relayed the details of the rape at age 16. She was fully oriented, her mood was moderately anxious,

5

and her affect was congruent to her mood and thought content. There were no signs of disordered thought processes or vegetative symptoms of depression. She denied suicidal or homicidal ideation.

Dr. Tinnin diagnosed Plaintiff with PTSD. He found her GAF was currently 60, and opined it was expected to be 82 at discharge (R. 187).

On September 15, 1999, Plaintiff told Dr. Tinnin she had had a migraine headache since the last session (R. 185). She reported her migraines were usually triggered by memories of the rape. He scheduled her to begin trauma therapy.

On October 1, 1999, Plaintiff told Dr. Tinnin her mother was being operated on that day for lung cancer (R. 185). The doctor noted: "However, her mood has been euthymic and stable." She reported some anxiety attacks, but none for the past week. Her migraines were about the same.

Plaintiff's treating physicians during the entire relevant period were Edwin Morris, D.O. and Lisa Conniff, a physician's assistant in Dr. Morris' office (R. 362). She had been seeing these doctors since at least December 1998. She received many of her prescriptions and injections for her migraines from them.

On December 15, 1999, Plaintiff saw Dr. Morris for headache with neck pain. He diagnosed cervical strain and migraine and gave her an injection of Nubain and Phenergan. Two days later, Plaintiff followed up with Dr. Morris and received another injection and a prescription for hydrocodone.

On December 27, 1999, Dr. Morris prescribed Prozac (R. 362).

On January 14, 2000, Dr. Morris prescribed Phenergan and Vicodin (hydrocodone) (R. 362).

On February 1, 2000, Dr. Morris prescribed Vicodin (R. 361).

On February 14, 2000, Dr. Morris prescribed Vicodin.

On March 2, 2000, Plaintiff presented to Dr. Morris with complaints of a migraine that

6

started the day before (R. 361). He gave her an injection of Nubain and Phenergan and refilled her prescriptions for Vicodin and Phenergan.

On March 13, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and a prescription for Vicodin.

On March 15, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan(R. 360).

On March 24, 2000, Dr. Morris gave Plaintiff an prescription for hydrocodone.

On April 3, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin.

On April 4, 2000, Dr. Morris gave Plaintiff an prescription for Nubain and Phenergan.

On April 20, 2000, Dr. Morris gave Plaintiff a prescription for Hydrocodone and Phenergan.

On April 25, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin

On April 26, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 10, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin.

On May 11, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 12, 2000, Plaintiff presented to Chestnut Ridge requesting an evaluation and follow-up of PTSD (R. 166). She stated she was having flash-backs of a rape that occurred in 1989. She stated the PTSD was ruling her life and she wanted to move on. Her only reported symptom was migraines. She stated she had never thought about or attempted to hurt herself or anyone else.

On May 17, 2000, Dr. Morris gave Plaintiff a prescription for hydrocodone.

On May 22, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and

prescription for Vicodin.

On May 23, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 24, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 26, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Esgic.

On June 2, 2000, Plaintiff was seen at Chestnut Ridge to get a referral to Dr. Tinnin at the Trauma Recovery Center for chronic PTSD (R. 165). She was "well known" in the neurology department, having a 6-7 year history of migraines. She continued to have headaches despite medication. She complained that she was very irritable and "*not capable of loving/dating one guy for six months*," (emphasis added), insecure about her relationship, pretty nervous, anxious, and having frequent flashbacks about a rape, re-experiencing the event through intrusive recollection or nightmares. She reported she was raped by "one guy" one day prior to her 16th birthday. She was unaware he had been drinking and they drove to a lake. He brought her to his friend's house and raped her in the bedroom on the waterbed.

Plaintiff's "current symptom" list included sleep change, appetite change, weight change, and anxiety. She did *not* check the symptoms: crying, energy level, poor concentration, memory problems, pain, suicidal thoughts, homicidal thoughts, irritability, confusion, panic, self-injurious behavior, hearing voices, racing thoughts, seeing objects or people others did not, paranoia, nightmares or avoiding people/places on the list of possible symptoms (R. 163).

On June 13, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 14, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 15, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 16, 2000, Plaintiff presented to West Virginia University Hospital for complaints of migraine headache with syncope for the past five days (R. 132). A CT scan and lumbar puncture were both normal. She was diagnosed with migraine headache and given an IV of Nubain and Phenergan, after which she improved (R. 135). She was discharged with Vicodin to take home.

Plaintiff did not show for her next appointment with Chestnut Ridge on June 19, 2000 (R. 162).

On June 20, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin.

On June 26, 2000, Plaintiff reported to Chestnut Ridge that she was feeling very irritable, anxious, and having mood changes. She stated the Prozac was not working and wanted to change to Zoloft, apparently due to television advertising. She said she had had a migraine headache for seven days and asked for a prescription. Upon mental status exam, she was alert, oriented and pleasant. Her mood was irritable, her affect congruent. Eye contact was normal. She denied suicidal or homicidal ideation or hallucinations.

On June 29, 2000, Dr. Morris gave Plaintiff a prescription for Esgic.

On June 30, 2000, Dr. Morris gave Plaintiff a prescription for hydrocodone and Phenergan.

On July 7, 2000, Plaintiff told her providers at Chestnut Ridge that she was "worse than ever" (R. 160). She could not eat or sleep, and was crying all the time, jittery and exhausted. She was very irritable. Her headaches were worse and more frequent. She had no improvement on Zoloft. She was having more flashbacks than she had had on Prozac. Her *recent stressors* were *"that the father of her 5 yr. old has been back in her life* and she was hoping for marriage but he recently told her he is not ready for that commitment." (Emphasis added). He had driven her to the appointment,

9

however. She had a pain clinic appointment but was told her insurance would not pay. It also would not cover therapy with Dr. Tinnin at the Trauma Institute. She was alert and oriented with good eye contact and verbalization. She was teary-eyed throughout the visit. She had no suicidal or homicidal ideation.

On July 19, 2000, Plaintiff presented to Dr. Tinnin (R. 185). She was in a dysphoric mood as she said she had been dealing with a migraine headache since the prior evening. She continued to have chronic migraines diagnosed as stress related. She reported *she and her long-time boyfriend broke up nine months earlier because he "couldn't take it anymore with my headaches."* (Emphasis added).

On July 27, 2000, Plaintiff telephoned Chestnut Ridge and said she was having "blackouts" due to Neurontin. She said she was buying things she couldn't remember buying but knew she did because of notes in her checkbook. She also said the writing in the checkbook was different from her normal writing, and she had put several miles on her car that she did not remember. She was afraid she might be leaving her children home alone at night.

On August 4, 2000, Dr. Morris gave Plaintiff a prescription for hydrocodone

On August 5, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On August 7, 2000, Dr. Morris gave Plaintiff a prescription for hydrocodone and Phenergan.

On August 15, 2000, Dr. Morris gave Plaintiff a prescription for Esgic.

On August 16, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On August 17, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin.

On August 29, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and

prescription for Vicodin.

On September 1, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Esgic.

On September 9, 2000, Dr. Morris gave Plaintiff a prescription for Claritin.

On September 15, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On September 23, 2000, Plaintiff was diagnosed with a urinary tract infection.

On September 27, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Vicodin.

On September 28, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On September 28, 2000, Dr. Morris gave Plaintiff a second injection of Nubain and Phenergan.

On October 13, 2000, Plaintiff reported being off Prozac, Zyprexa, and Neurontin for 3-4 months (R. 347). She now felt very nervous and anxious. Her doctor diagnosed depression, anxiety, and psychosis and restarted Prozac, Zyprexa, Neurontin, and Xanax (R. 347).

On October 19, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On October 23, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescriptions for Esgic and Celexa.

On October 24, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On October 25, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan .

On November 9, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On November 14, 2000, Plaintiff phoned Dr. Morris' office very anxious and upset (R. 346). She said she was shaky and nervous. She had taken one Xanax. She was told to take another Xanax.

On November 25, 2000, Plaintiff said she had passed out at work due to headache (R. 345). Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and a prescription for hydrocodone.

On November 27, 2000, Plaintiff phoned Dr. Morris' office saying she was very anxious and afraid she may be having flashbacks (R. 345). She said she had lost 10 pounds in the last two weeks. Dr. Morris increased her Celexa and started her on Xanax.

On December 5, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for hydrocodone.

On December 6, 2000, Dr. Morris noted Plaintiff had marked tenderness and muscle spasm in her neck muscles (R. 344). He diagnosed migraine headache and gave Plaintiff an injection of Nubain and Phenergan.

On December 18, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Esgic Plus.

On December 19, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On December 27, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for hydrocodone and Phenergan.

On December 28, 2000, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On January 1, 2001, Plaintiff presented to the hospital with complaints of headache and nausea that reportedly caused her to pass out (R. 573). She was given an IV of Phenergan and Toradol. At her request, she was provided Nubain.

On January 3, 2001, Plaintiff told Chestnut Ridge she was doing better (R. 158). She was still overwhelmed at work and feeling "empty inside." Her sleep was "so-so," though she was not having bad dreams anymore. She was anxious when out, but felt supported at home. She appeared

12

anxious. Her mood was dysthymic and down. She had good eye contact. Her affect was constricted. Her mood appeared anxious and depressed. She had no suicidal or homicidal ideation.

On January 11, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

Throughout the entire above-recited history, Plaintiff continued to work as a store department manager. She stopped working sometime in January 2001 (R. 70).

On January 29, 2001, Plaintiff presented to Chestnut Ridge for "crisis intervention, saying she was feeling drowsy and sedated with low energy in the daytime" (R. 157). She was sleeping most of the day and said she was unable to take care of her children. She denied suicidal ideation. She could not afford trauma recovery treatment or regular counseling sessions. She appeared disheveled and drowsy. Her mood was anxious and depressed. Her affect was constricted. She had no suicidal or homicidal ideation. Her insight was good and her judgment reliable. She was diagnosed with PTSD and Major Depressive Disorder.

On February 9, 2001, Plaintiff told Chestnut Ridge she was doing better, was less anxious, had better sleep, and had no nightmares or daytime drowsiness (R. 156). She appeared calmer and less stressed out, although chronic headaches continued to be a problem. She currently reported another several-day-long headache. Her mood was minimally improved with less anxiety. Her affect was constricted. Her speech was soft. She had no suicidal or homicidal ideations.

February 9, 2001, is also Plaintiff's protective filing date for disability (R. 80).

Plaintiff presented to Valley Mental Health for a psychological evaluation on February 22, 2001 (R. 183). She reported she was currently in a 6-year relationship. On mental status examination she was alert, oriented and cooperative. Her speech was clear and productive with good comprehension. Her mood and affect were dysthymic. She denied any suicidal or homicidal

13

ideation. Her memory was intact. She had no delusional thinking. She did serial three's with one mistake. She was diagnosed with PTSD.

Plaintiff filed for benefits on February 26, 2001, due to PTSD and migraine headaches (R. 71). She stated these affected her ability to work because she had "panic attacks and flashbacks. When this happens I get a migraine and sometimes pass out with them." The only medications she reported taking were Celexa and Zyprexa (antidepressants) and Depakote for headaches (R. 76). She remarked:

> I suffer from Post Traumatic Stress disorder (PTSD). This disorder causes me to have flash backs from a trauma I had April 10, '89. I surpressed [sic] the trauma for many years and when I started having the flash backs I broke down. I have panic attacks a lot and a split personality. When my panic attacks are bad I usually get a migraine headache and with the headache I pass out.

(R. 78).

On March 1, 2001, Plaintiff reported headache for 2 days (R. 337). She had no weakness, no fatigue, and no fainting. She did report blurred vision, nausea, and vomiting. Psychiatrically she reported no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies. Physical exam revealed cervical spine and thoracic spine tenderness. The doctor diagnosed headache and neck sprain and strain. Plaintiff received an injection of Nubain and Phenergan and a prescription for hydrocodone.

14

On March 3, 2001, Plaintiff reported being the same, but with blurred vision, nausea and vomiting resolved (R. 335). Her doctor diagnosed headache and gave Plaintiff an injection of Nubain and Phenergan. Psychiatrically she reported no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies.

On March 10, 2001, Plaintiff completed a Daily Activities Questionnaire stating she was "a mother for 2 little boys" who depended on her for care (R. 84). She said she had trouble sleeping at night, but that this was not a change since her condition began. She *did not nap* during the day. She *needed no help* with personal needs. *She made breakfast, lunch and dinner (consisting of full-course meals) for herself and her children. Her daily activities included laundry, vacuuming, dusting, paying bills, mopping, washing dishes, managing bank accounts, running errands, and taking out the trash (R. 85). She had no assistance with any household chores. She shopped for food, clothing and medication about twice a week, driving herself. She read magazines and books and watched television.* She had no hobbies or interests. She stated "sometimes I don't feel like doing anything because of my *panic attacks*." (Emphasis added). She visited her mother every month or so. Sometimes she picked her children up from school. She did not feel like being around a lot of people because of her panic attacks. She said she sometimes had trouble concentrating when she had a migraine or panic attack.

On March 14, 2001, Plaintiff reported to Dr. Morris that she had a headache with neck pain and nausea and vomiting (R. 332). Doctor Morris diagnosed neck sprain and strain and headache and gave Plaintiff an injection of Nubain and Phenergan.

On March 26, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan. Psychiatrically she continued to report no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies.

On March 27, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and a prescription for hydrocodone. Her only diagnosis was "Unspecified migraine (general)."

On April 2, 2001, Plaintiff complained of neck pain for four days (R. 324). Her headaches had resolved. Doctor Morris diagnosed neck sprain and strain and thoracic sprain and strain.

On April 4, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for hydrocodone. Her only diagnosis was Headache. Psychiatrically she continued to report no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive

episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies.

On April 10, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescription for Esgic. There were still no reported psychiatric symptoms. Dr. Morris diagnosed only "Unspecified migraine (general)" (R. 320).

On April 12, 2001, Dr. Morris diagnosed thoracic sprain and strain, lumbar strain and sprain, and headache. He gave her an injection of Nubain and Phenergan.

On April 12, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan. The only diagnosis was Migraine (general).

On April 16, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On April 17, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On April 26, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On April 27, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan. Her only diagnosis was "Headache." She continued to report no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies.

On April 28, 2001, Plaintiff presented to the hospital with complaints of headache and passing out with vomiting and nausea (R. 566). She was given IV Nubain and Phenergan.

17

On April 30, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan. Her diagnosis was "Headache," still with no reported psychiatric symptoms.

On May 1, 2001, Plaintiff presented to the hospital with complaints of migraine (R. 560). She was given two injections of Nubain and Phenergan.

On May 5, 2001, Plaintiff presented to the hospital with complaints of headache with nosebleed (R. 555). She was given orphenadrine and Phenergan. 45 minutes later all symptoms had resolved. She was advised to use Neo-Synephrine nasal spray if her nosebleed recurred, along with nasal saline spray and a cool-mist humidifier.

On May 7, 2001, Plaintiff reported headache for three days with a nosebleed on Saturday (R. 297). She was diagnosed only with "Headache" and given an injection of Nubain and Phenergan.

On May 18, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 19, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 22, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 23, 2001, Plaintiff reported the last shot did not help headache (R. 287). She was given another injection of Nubain and Phenergan and samples of Zanaflex.

On May 29, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 30, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On May 31, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On Sunday, June 3, 2001, Plaintiff presented to the hospital with complaints of headache for two days with vomiting (R. 550). She was given Vistaril and Phenergan and a prescription for Esgic Plus.

On June 4, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and a

prescription for hydrocodone.

On June 5, 2001, Plaintiff presented to the hospital for migraine headache (R. 545). She was offered but refused Imitrex, saying it caused her to have panic attacks.[2] She refused Phenergan saying it did not work.[3] She refused DepoMedrol,[4] stating she had gotten a shot on Wednesday.[5] She said she was unable to take other medications due to nausea, but the attending noted she refused to take Phenergan, which is used for nausea.

On June 5, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 11, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 12, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On June 15, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan and prescriptions for Klonopin, Elavil and hydrocodone (R. 269).

SSA denied Plaintiff's application on June 12, 2001 (R. 37).

On June 16, 2001, Plaintiff complained to Dr. Morris of headache, nose bleed, ear pain, and sleeplessness (R. 264). He gave her injection of Nubain and Phenergan.

On June 18, 2001, Plaintiff complained of headache and nose bleed for three days (R. 261). Dr. Morris gave her an injection of Nubain and Phenergan and a prescription for Inderal.

At about 9:30 p.m. that same day, Plaintiff presented to WVU Hospital for complaints of

---

[2]The undersigned could find no reference to this as an alleged side effect in the record.

[3]Despite the fact she received injections of Phenergan often from Dr. Morris.

[4]An anti-inflammatory medication. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1147 (30th ed. 2003).

[5]The undersigned could find no reference to Plaintiff having been given a shot of DepoMedrol before this occasion.

headache for two weeks which increased that night (R. 623). She said she had taken Phenergan (R. 628). She was given Nubain and Phenergan twice by IV. She was discharged with a prescription for Esgic.

On June 26, 2001, Plaintiff complained of headache for three days (R. 258). It was noted her nosebleeds had resolved. Again the doctor's "Review of Symptoms" notes Plaintiff reported no hyperventilation, no prolonged insecurities, no persistent or recurrent depression, no initial or fragmented sleep disturbances, no inappropriate or excessive irritability, no persistent or frequently recurrent anxieties, no excessive or persistent indecisiveness, no inappropriate shyness, no visual, auditory or tactile, hallucinations, no excessive use of alcohol, no use of illicit drugs, no suicidal or homicidal ideation, no persistent worrying, no obsessive tendencies, no manic depressive episodes or illness, no diagnosis of manic depressive disorder, no sexual dysfunctions, no paresthesias, no panic attacks, and no compulsive tendencies. She was diagnosed with "Headache" and given an injection of Nubain and Phenergan and prescriptions for hydrocodone and Phenergan.

On June 29, 2001, Plaintiff presented to Valley Mental Health for an evaluation (R. 407). It was indicated she was taking Celexa and Elavil as anti-depressants and Zyprexa, an anti-psychotic. Her only reported severe symptom in the past 90 days was anxiety; however she was not taking any anti-anxiety medications. At the "moderate" level of symptoms/behaviors in the past 90 days, she reported poor concentration, treatment motivation, depression, worthlessness, hopelessness/helplessness, crying, panic, manic agitation, distractability, and sleep problems. She had mild feelings of guilt. The report indicates Plaintiff *did not have substance abuse, blunted affect, inappropriate affect, phobia, flat affect, change in appetite, high or low energy, apathy, hyperactivity, loss of interest in activities, hallucinations, delusions, paranoia, tangential thinking,*

*loose association, thought blocking, suspiciousness, concept disorganization, withdrawal, poor judgment or suicidal or homicidal ideation (R. 409). She did not require any assistance in activities of daily living, managing finances, maintaining relationships or managing free time. Her primary problem was listed as psychiatric symptoms with no additional problems, mental or physical.* It was opined she ranked at the moderate to severe level with symptoms of depression, anxiety, decreased concentration, "very somatic," poor sleep, and migraine headaches.

On July 2, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 3, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 6, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 10, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 11, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

Plaintiff filed a Request for Reconsideration on July 13, 2001. On her Reconsideration Disability Report she stated her symptoms had worsened, stating: "*I am now hearing voices & hallucinating*, more frequent headaches" (R. 91). (Emphasis added). She also reported having "more non-functional days."

On July 14, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 15, 2001, Plaintiff presented to the hospital with complaints of severe panic attacks with hallucinations and "hearing voices" (R. 540). She was given Ativan and discharged.

On July 17, 2001, Plaintiff was admitted to the Structured Outpatient Program ("SOP") (R. 366). She listed fainting spells, dizziness, memory problems, and frequent or severe headaches due to migraine as her symptoms and stated hallucinations and anxiety were her worst problems (R. 492). She was prescribed Wellbutrin, Paxil, and Zyprexa.

On July 18, 2001, Plaintiff presented to the hospital with complaints of PTSD with increased

21

anxiety (R. 535). She was being treated as an outpatient at the hospital. She was given Ativan.

On July 20, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On July 24, 2001, Plaintiff was referred to an ENT for nosebleeds (R. 237).

On July 25, 2001, Plaintiff presented to the hospital for a main complaint of nosebleed, with headache (R. 530). She was given Phenergan and a shot of Demerol.

On July 31, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On August 7, 2001, Plaintiff was diagnosed with cephalgia, neck sprain and strain, unspecified temporomandibular joint disorder, headache, and TMJ syndrome (R. 234). She was given an injection of Nubain and Phenergan and a prescription for Axert.

On August 7, 2001, the SOP prescribed Klonopin (R. 366).

On August 8, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On August 8, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan for headache and TMJ.

On August 16, 2001, Plaintiff complained of headache and jaw pain (R. 225). Dr. Morris gave her an injection of Nubain and Phenergan and prescription for hydrocodone.

On August 22, 2001, Plaintiff underwent a total hysterectomy for chronic pelvic pain and endometriosis (R. 496). She also had a nasal lesion removed at the same time (R. 365). She was discharged two days later with instructions to have two quiet weeks at home before going out at all. On August 26, however, she "had gone shopping for school supplies with her children." She told the nurse the day after that "she has two children at home, ages 6 and 8 and *she really needed to take care of them and the house* and had basically overdone it." (Emphasis added).

On August 27, 2001, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

22

On August 29, 2001, Plaintiff complained of nausea. She was given an injection of Nubain and Phenergan. She reported having vomited and tore open stitches from her recent hysterectomy (R. 220). Her jaw was also hurting and she felt it was the cause of her pain. Her doctor referred her to a physical therapist for assessment of TMJ.

Plaintiff presented to physical therapist Joel Rauser on August 30, 2001 for complaints of jaw pain/possible TMJ (R. 585). The therapist found she did have limited jaw movement and TMJ, and scheduled her for therapy.

Plaintiff had no increase in range of motion of her jaw after two treatments (R. 584).

On September 5, 2001, Plaintiff had increased range of motion of her jaw with therapy (R. 584). She did not have much soreness upon leaving, but the therapist noted that Dr. Morris' office had called about an hour later, stating that Plaintiff had told them that he (the therapist) had recommended a pain shot. The therapist informed them he had not recommended a pain shot.

That same day, Dr. Morris gave Plaintiff an injection of Nubain and Phenergan.

On September 10, 2001, Plaintiff complained of headache (R. 217). Doctor Morris diagnosed neck sprain and strain, thoracic strain and sprain, lumbar strain and sprain, sprain and strain of lumbosacral (joint)(ligament), and cephalgia. He gave her an injection of Nubain and Phenergan and a prescription for hydrocodone.

On September 11, 2001, Plaintiff complained to the physical therapist that she still had jaw pain (R. 584). Her range of motion continued to improve, however.

On September 12, 2001, Plaintiff reported taking Klonopin, Trazadone, Zyprexa, Paxil, and Wellbutrin.

On September 27, 2001, Plaintiff underwent a psychiatric evaluation performed by Dr.

Radhika Mehendru, M.D. (R. 364). She again reported taking Klonopin, Paxil, Zyprexa, and Wellbutrin. *She reported having no side effects from her medications, and Dr. Mehendru noted none.* Since increasing Paxil she was dealing with her tactile hallucinations, dreams, intrusive thoughts, and anxiety and depression better (R. 363). Her mental status was fully oriented, mildly anxious, with good eye contact, normal speech, no delusions, and no hallucinations. Dr. Mehendru diagnosed PTSD and Panic Disorder.

On October 1, 2001, Plaintiff presented to the hospital with complaints of migraine for four days (R. 487). She was given a shot of Demerol and Phenergan and a prescription for Fioricet.

On October 2, 2001, Plaintiff was discharged from the Structured Outpatient Program (R. 490). Her discharge diagnosis was PTSD and panic disorder. Dr. Mehendru noted the severity of her stressors was moderate and her GAF was 50, the same as on admission to the unit. *He opined Plaintiff was not psychotic, not suicidal, and not homicidal.* Her tactile hallucinations had decreased and her depressive and anxiety symptoms were improving. Her admitting and discharge GAF's were both 50.

On October 3, 2001 (the day after her discharge date from the SOP), Plaintiff presented to the hospital reporting "having homicidal ideations towards a man who she states raped her" (R. 472). Her chief complaint was: "I feel like hurting him. I wanted to kill him." Dr. Mehendru again performed a psychiatric evaluation of Plaintiff, noting he had seen her in the Structured Outpatient Program at the same hospital on September 27, 2001 (R. 472). He noted:

> [Plaintiff] states that after she got discharged from there [the SOP], she has been having recurrent dreams, intrusive thoughts, flashbacks, and nightmares. Yesterday she reports that the dreams were very strong and she felt that she was going to hurt the man who raped her when she was age sixteen. She reports that the man is around the area and she has seen him a couple of times. She had thoughts of wanting

24

> to hurt him, but the patient again states that she has her two children and if she did anything like that she would have to face the consequences like being arrested and going to jail and that she would not do anything that would prospectively harm her children or be taken away from her children.

(R. 472). Plaintiff told Dr. Mehendru she was anxious, restless, and felt nervous, with decreased sleep and decreased appetite. She denied feeling depressed or suicidal. She also reported that in the last two to three months she had been hearing voices and they had been increasing in nature.

Plaintiff was admitted to the hospital "for having homicidal ideations toward a man who she states raped her." Dr. Mehendru noted Plaintiff's urine drug screen on admission was positive for barbiturates and opiates. He noted Plaintiff had a history of migraine headaches and had been seeing Dr. Morris for those. He noted she had received an injection of Nubain the day before, and had also been on Esgic Plus for the headaches, which would account for the positive test. Dr. Mehendru contacted Dr. Morris to discuss Plaintiff's case, and Dr. Morris told him he "felt that the patient is tending to become dependent on these medications . . . ." and he was going to begin putting her on a schedule. Dr. Mehendru noted Plaintiff was "requesting for her Esgic but [] not overtly trying to seek them."

Dr. Mehendru noted under "past medical history" that Plaintiff had a history of migraine headaches for which she was on Esgic and that she got Nubain and Phenergan injections periodically. Plaintiff reported living with her husband, whom she had married 3 ½ months earlier, but with whom she had been living for the past seven years, as well as with her two boys, ages eight and six (the first with her previous husband and the second with her present husband).

Upon mental status examination, Plaintiff was cooperative, had a wandering eye contact, her speech was normal in rate, rhythm and volume, her thought processes were goal directed and logical,

and her affect was anxious and constricted. She described her mood as: "I feel nervous and I am having a headache." She denied any delusions. She denied any suicidal ideations. She reported passive homicidal ideations toward the man who raped her, but no intent or plan. She denied auditory hallucinations. Her insight and judgment were limited. She scored a perfect 30/30 on a mini mental status examination.

Dr. Mehendru diagnosed Plaintiff with PTSD and Rule- out Major Depression with Psychotic Features (R. 474). He assessed her GAF as 25. He decided to discontinue Wellbutrin "because it was recently started and the patient has started to have recent auditory hallucinations."

On October 4, 2001, Plaintiff saw Richard Stadtmiller, M.D., for a physical examination while in the hospital (R. 469). The examination was normal and neurological exam was grossly normal. The impression remained PTSD, Rule-out major depressive disorder with psychotic features, and migraine headaches by history. Dr. Stadtmiller ordered Esgic for Plaintiff's migraines. He found no other medical problems except slight anemia, which may have been due to her recent hysterectomy.

Plaintiff saw Dr. Mehendru next on October 5, 2001, while she was still in the hospital (R. 466). Dr. Mehendru noted he had spoken with Plaintiff's family, including her husband, and her sister who worked at the hospital. Dr. Mehendru reported:

> Upon my lengthy discussion with her family, which included her sister, who works in Fairmont General Hospital, and her husband, they reported to me that Plaintiff has been having this knack of talking to other people who have mental illnesses and finding out about their symptoms and making their symptoms her own. For example, she met somebody who had a history of panic disorder with agoraphobia and after that, she started saying that she is afraid of being in crowded places. She was also trying the learn the symptoms that her sister has, who suffers from bipolar affective disorder and also tried to make those symptoms her own. Now, most recently, she

26

started saying that she has a split personality and calls one of the Tommy and states that she does not have a name for the second person that she claims to be. When she told this to her sister-in-law, her sister-in-law said "you don't have a split personality." That was the time when she came to the hospital and checked herself in as "Tommy." She states that she does not have a recollection for that but that is something that she has been discussing with me during the interviews. She was also trying to ask me and find out if she has schizophrenia, schizoaffective disorder, bipolar disorder. At this time, the patient has applied [for] disability and she was denied it the first time. Then she arranged for a lawyer who got her an interview with a psychiatrist in Morgantown, West Virginia from disability which was approximately a couple of weeks ago. The patient's husband tells me that while she is at home, *she takes very good care of her two children. She is very much involved in their activities and their school*. She cooks but does not take care of her house as much as he would like her to take care of. The only thing he stated was that she has these headaches for which she is constantly in touch with Dr. Morris, who has been prescribing her Esgic and has been receiving Nubain injections and Sinigrin injections. He has also seen her vomit sometimes when she has these headaches. When I discussed this with Dr. Morris, he reported that he feels that she is probably getting addicted to the Esgic and the Nubain injections. When asked why the patient was started on Zyprexa, she reported that Dr. Kurapati had started her for sleep. Since the Wellbutrin was discontinued, the patient denied hearing any voices, which makes me think that the voices could have been, *if present*, Wellbutrin induced. I will discuss the case with Dr. Foster regarding the ongoing use of Zyprexa and a possibility to discontinuing it in the future. *I also would rule out the possibility of malingering*. Diagnostically, I think, at this time, she has post-traumatic stress disorder and panic disorder.

(R. 467). (Emphasis added). Although on admittance Dr. Mehendru assessed Plaintiff's GAF as 25, on discharge only two days later, he assessed it as 50. He expressly found she was *not* depressed, *not* suicidal, *not* homicidal and *not* psychotic (R. 464). She was stable psychiatrically to be discharged home. He prescribed only Paxil, Trazadone for sleep and Klonopin for anxiety (R. 465).

Plaintiff saw psychologist John Damm, Ed.D., at the request of the State agency on October 7, 2001 (R. 369). Plaintiff stated she suffered from pain in her limbs, numbing sensation or aching,

27

vomiting, and seeing "floaters" in front of her eye during migraines. She also said she was photosensitive and certain scents made her nauseous. She told him Imitrex helped.[6] The migraines usually incapacitated her for a day. She said she had the migraines more often than not, and this was the first day in a week she did not have one.

Plaintiff also stated she began suffering from PTSD symptoms about two years earlier. She said she had been raped "*by several individuals*" at age 15. (Emphasis added). She said she began reliving the event two years ago. She had nightmares and disliked being in public. She suffered from panic attacks. She said she experienced these symptoms about three days per week. She said her birthday is a trigger for her PTSD symptoms because the rape occurred on her birthday.

Plaintiff reported taking Prozac for a few years, but said it became ineffective after some time. She took Wellbutrin in the morning as well as Klonopin and Trazadone.

Plaintiff said she attempted suicide four years earlier and began receiving treatment. She was in group therapy twice a week at Fairmont General Hospital. She had had 11 visits.

Plaintiff married her present husband in June of that year, four months earlier. She reported her sister had bipolar disorder. She said her parents were divorced and her life was similar to the character in "Walking Tall," because her father was a local law enforcement officer and her family was always in danger. On two occasions, they were moved to a "safe house." In addition her father was abusive toward herself and her mother.

Upon Mental Status Examination, Plaintiff was cooperative, pleasant, and talkative. She made adequate eye contact and provided lengthy, in-depth information. She was able to maintain a conversation and provided information spontaneously. Her speech was clear, relevant, and

---

[6]The undersigned notes that Plaintiff refused Imitrex five months earlier, stating it caused panic attacks.

coherent. She was fully oriented. Her mood was "somewhat apathetic and sullen." Her affect was consistent with her mood and somewhat flat. Thought processes were within normal limits and thought content was within normal limits. She was not suffering from illusions or hallucinations. She had adequate insight and no homicidal or suicidal ideation. She could recall four out of four items immediately, and two out of four items after 30 minutes. She sometimes had trouble recalling details, but her remote memory was adequate. She completed serial sevens with one error. There was no significant agitation or retardation noted.

*Plaintiff stated she typically got up at 6:00 a.m. to get her children ready for school. After they'd gone she did household chores such as cleaning or laundry. When the children returned home, she tried to help them with their homework. She fixed dinner and then sat and read books with her children. They usually went to bed around 8:00 p.m., then she spent time with her new husband. She enjoyed riding bikes and going swimming.* She had a couple of friends she might see during the week. She did not belong to any group or church. She claimed limited involvement in activities other than spending time with her family. (Emphasis added by the undersigned).

Dr. Damm noted Plaintiff's subjective symptoms as depression, anxiety, panic, and migraines, and her objective symptoms as depression, anxiety, and trauma. He diagnosed PTSD and Major Depressive Disorder versus Dysthymia (R. 374). *He opined her social functioning was within normal limits; her concentration was mildly impaired; her persistence and pace were within normal limits; her immediate memory was within normal limits; and her recent memory was mildly impaired.*

On October 11, 2001, State agency reviewing psychologist Joseph Kuzniar, Ed.D. completed a Mental Residual Functional Capacity Assessment opining Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a

29

schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors' get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. She was otherwise not limited or not significantly limited in any category (R. 377-378).

Dr. Kuzniar opined Plaintiff retained the capacity to understand, remember, and carry out somewhat complex instructions, but due to PTSD, she avoided crowds and people. She retained the capacity to manage a low social interaction demand work setting. She retained the capacity to manage a low-stress, low- pressure work setting (R. 379).

Plaintiff was again assessed by a social worker at Valley Mental Health on October 15, 2001 (R. 400). She had just returned from a three-day voluntary hospital stay for reported auditory and visual hallucinations. She was not suicidal but reported being severely homicidal due to memories of PTSD. She also self-reported severe withdrawal for more than one year, impulsivity, and poor judgment. She reported an acute/crisis level of hallucinations; moderate tangential thinking; severe poor concentration; moderate depression; acute/crisis concept disorganization; acute/crisis anxiety; and acute/crisis panic for more than one year.

That same date Plaintiff's treating psychiatrist at Valley noted she was fully oriented, calm and comfortable with no evidence of anxiety (R. 399). Her affect and mood were euthymic and she had no suicidal or homicidal ideation. He noted that Plaintiff's "medical compliance is in serious doubt."

30

On October 29, 2001, State agency reviewing physician Fulvio Franyutti, M.D. noted Plaintiff's long history of treatment for migraines, including 44 doctor visits where she received Nubain and Phenergan within less than a year. He also noted her normal laboratory studies, and "Possibility of drug addiction to be considered (Strongly)" (R. 386). He nevertheless opined that Plaintiff was capable of performing work (R. 381).

On November 2, 2001, SSA sent out its Disability Determination, affirming the June 12, 2001, Initial Determination finding Plaintiff not disabled (R. 39).

On November 10, 2001, Plaintiff presented to the hospital with complaints of migraine for two days (R. 453). It was reported she passed out while walking through the emergency room door. She also reported vomiting blood that day. She refused Imitrex,[7] once again saying it gave her panic attacks. She was given IV Nubain and Phenergan. She had a lumbar puncture which was negative. She had a second IV of Nubain and Phenergan and said she wanted to go home, stating she no longer had any pain. She was given a prescription for Esgic (R. 451).

On Plaintiff's Request for Hearing dated November 26, 2001, Plaintiff stated her condition had worsened and she was now having panic attacks (R. 99).

On December 3, 2001, Plaintiff's treating psychiatrist at Valley noted she had been taking her meds up until she ran out a week earlier (R. 398). Plaintiff reported gaining 20 pounds in one month. She reported a man tried to seduce her recently and she was having a great increase of symptoms since then. She cried frequently, was unable to relax, and was tense all the time. Objectively, the psychiatrist found her fully oriented with an apprehensive affect and anxious and depressed mood. Plaintiff denied suicidal or homicidal ideations and delusions. The psychiatrist

_____

[7]The undersigned notes the record shows Plaintiff told Dr. Damm one month earlier that Imitrex helped. She did not mention it causing panic attacks.

found she had regressed *due to not taking her medications.*

On December 17, 2001, Plaintiff presented to the hospital with complaints of headache she said were similar to her previous headaches but worse (R. 448). She reported a near-syncopal episode. Her last headache had resolved, but she woke this morning with another-worsened. She also reported passing out and vomiting. It was noted Plaintiff laughed appropriately and she had not tried any medications. The record also notes: "Sister relating patient is a drug-seeker." Plaintiff's sister worked at the hospital. Plaintiff was given two IV's of Nubain and Phenergan, after which Plaintiff said her pain was "maybe a 4," and was discharged.

On February 7, 2002, Plaintiff presented to the hospital reporting she had been in a single-vehicle accident (R. 438). She complained of neck, shoulder, back, and lower back pain. A CT scan of the head showed no abnormality (R. 443). X-rays of the chest, pelvis, and neck were also normal. She was prescribed Norflex and Anaprox, but was warned to avoid medications that were sedating. She was diagnosed with acute cervical and lumbar strain (R. 436).

On March 5, 2002, Plaintiff's psychiatrist at Valley diagnosed her with major depressive disorder, recurrent, with psychotic features; PTSD; and rule out bipolar disorder (R. 396). Plaintiff stated she was unable to sleep and had no urge to get up and clean and cook. She was still having nightmares and flashbacks. She said she had audio, tactile, and visual hallucinations. She felt spiders on her and saw things and shadows run by. She heard the chatter of voices. She was more depressed, less interested. She also felt guilty because she had wrecked her new car and felt guilty and worthless for not doing anything, with less energy and less appetite. She had no suicidal or homicidal ideations.

That same day, neuropsychiatrist W.D. Cutlip opined Plaintiff's affect was minimally

constricted and her eye contact was good. She reported taking Doxepin, Klonopin, Trazadone, and Risperdal.

On March 11, 2002, Plaintiff underwent a bilateral salpingo-oophorectomy (surgical removal of ovaries), lysis of pelvic adhesions, and appendectomy (R. 420).

On April 16, 2002, Plaintiff presented to her psychiatrist at Valley for a follow-up (R. 395). She continued to note poor sleep – five hours in a 24 hour period. She continued to note social stressors, most notably her relationship with her mother-in-law. In the past two weeks her mood symptoms worsened related to an incident she had with her mother-in-law where they exchanged words. She continued to have auditory hallucinations intermittently. These were improved in general since the increase in Risperdal. She had no recurrence of visual hallucinations at this time. At the end of the session, she began to complain of an acute migraine, became very nauseated, and laid on the floor.

On April 19, 2002, Plaintiff presented to Fairmont General Hospital with complaints of "a severe headache. My migraine from PTSD" (R. 414). She reported a history of migraines and syncopal episodes with "any stress" (R. 415). She had had an appointment with a dentist for TMJ and a new psychiatrist the day before, which triggered a migraine and "caused syncope multiple times." Plaintiff had a syncopal spell, with nurses nearby reporting she "gently crumpled to floor" (R. 413). She suffered no injury and was assisted back to bed. She was then given diphenhydramine and Ativan, and discharged with Darvocet.

About five hours later that same day, Plaintiff presented to WVU Hospital with complaints of "I passed out with migraine headaches" (R. 622). She complained of headache for three days with nausea, photophobia, and syncope. She was given two doses of Nubain and Phenergan by IV.

On May 25, 2002, Plaintiff presented to WVU for a migraine headache with vomiting for one week (R. 586). She described the headache as "like usual migraine headache but worse than usual." A CT of the brain and a lumbar puncture were performed. Both were negative. She was given an IV of Morphine. Later she was given an IV of Demerol and Phenergan. Plaintiff reported some relief of pain from the first dose of Demerol. The second dose helped "a lot." She was discharged the same day.

On June 5, 2002, Plaintiff presented to Valley for a follow up (R. 597). Plaintiff said she was doing fairly well. Her Risperdal had been increased and she found this helpful. She reported struggling with depression at times and asked to be placed on an antidepressant. She decided to try Zoloft. She complained of "low mood" and "mood irritability" "at times." She denied suicidal or homicidal thoughts. *She slept well at night as long as she took the Trazadone.* Upon mental status exam her mood was euthymic, her affect was broad, her speech was appropriate, she maintained good eye contact, there was no evidence of psychosis, and she denied auditory or visual hallucinations.

On July 3, 2002, Plaintiff presented to Valley for a follow up (R. 596). Plaintiff stated she had not noticed any significant difference in her symptoms since starting Zoloft. *She continued to have great difficulty sleeping.* Her nightmares had increased although her daytime flashbacks were somewhat better. She also had an increase in tactile hallucinations, worse at night. She would also see something moving out of the corner of her eye frequently. She did not have any suicidal or homicidal ideations. Trazadone was discontinued and Seroquel was added.

On July 12, 2002, SSA mailed a Notice of Hearing, scheduling an Administrative Hearing on Plaintiff's case for August 8, 2002 (R. 28).

On July 16, 2002, Plaintiff presented to the WVU Emergency Room for complaints of migraine headache (R. 609). At some point she "slid to floor" while waiting for the doctor, and complained of back and neck pain. She was given injections of Phenergan and Ultram and discharged home.

On July 23, 2002, Plaintiff presented to Valley for a follow up (R. 595). She reported having headaches requiring injections about three times per week. She also took Lorcet from time to time. She continued to report panic attacks, nightmares, flashbacks, and hallucinations. She felt her trauma symptoms had been worsening over the past several days. Dr. Cutlip noted Dr. Morris had called him to relate that Plaintiff had been having migraines requiring injection of Nubain nearly every other day. He also noted she had had multiple head scans that were normal.

Objectively, Plaintiff appeared mildly to moderately anxious. Her affect was constricted. Eye contact was good. Stream of thought was well-organized. There was no suggestion of ongoing dissociation or psychosis. Dr. Cutlip assessed escalating trauma and anxiety symptoms with increasing frequency of migraines and increased opioid consumption. Inpatient treatment was recommended.

Plaintiff was polite and cooperative and maintained good eye contact. Her mood was low, with a general broad affect. She had no suicidal or homicidal ideation. She reported positive auditory hallucinations, but not visual. Her speech was normal and thought processes were goal directed and logical. She was diagnosed with PTSD; MDD recurrent with psychotic features; rule out Bipolar Disorder; and Personality Disorder NOS (by history). Her GAF was 53.

On July 30, 2002, Plaintiff presented to WVU Hospital for complaint of headache with syncope (R. 601). She reported the last headache she had had that was as bad was six months earlier,

but that this was the "worst headache ever." A CT and lumbar puncture again showed no abnormalities. She was given two IV's of Nubain and Phenergan.

WVU transferred Plaintiff's care to United Hospital Center ("UHC") due to her complaints of: "I have PTSD; split personality; feeling agitated; my other personality is coming out; I was raped at age 16; Dreamed I was hurting him" (R. 658). She reported being depressed with audio and visual hallucinations, but not of the "command-type" (R. 656). The visual hallucinations were of mice and spiders. She also reported tactile hallucinations feeling like there were "things" on her. She reported a long history of depression. She remembered periods of depression since her childhood. She also reported a history of trauma, of her father being a police officer and "lots of threats towards the family with family having to stay at a safe house." She also reported being "tortured and raped" at age 16. She reported flashbacks and memories of the rape. Plaintiff's mental status was reported as cooperative, her affect constricted, eye contact good, with no suicidal ideation. She reported decreased sleep and appetite. Her mood was euthymic. Her speech was normal. She had no delusions, paranoia, or hallucinations. She was fully oriented and her memory was intact. Her judgment and insight were both good. She was assessed with Major Depression with Psychotic Symptoms and PTSD. Her GAF was assessed at 50.

Plaintiff was seen on August 1, 2002, at United Hospital Center ("UHC") by psychiatrist Muhammad Salman, M.D. (R. 631). Plaintiff's chief complaint was: "I was having thoughts to hurt the person who raped me." She reported a history of schizoaffective disorder[8] and PTSD. She also admitted to hearing voices and seeing unusual things that she could not describe in detail. On

---

[8]The undersigned was unable to find any actual diagnosis of schizoaffective disorder in the record, although Dr. Mehendru noted in October 2001 that Plaintiff "was also trying to ask me and find out if she has schizophrenia, schizoaffective disorder, bipolar disorder." Dr. Mehendru did not diagnose any of these disorders.

Mental Status Examination Plaintiff made appropriate eye contact. She was cooperative. She showed paucity of thought and did not initiate much information on her own. Her thought processes were logical and goal directed. She did not show any delusions. "She mentioned having 'different personalities.'" she described her mood as "feeling depressed." Her affect appeared constricted. Her cognition was intact and her insight and judgment appeared fair. Neurologic exam was essentially unremarkable as was physical exam. Dr. Salman diagnosed Schizoaffective Disorder, most recent episode depressed type; PTSD; and Dissociative Disorder. He assessed her GAF as 30. She was admitted to the hospital.

Plaintiff told her social worker that same day that she was "having a 'bad' headache" (R. 642). She believed it was because of her hormone patch. She said she was depressed. She described the rape. She reported a split personality "though never formally diagnosed by a doctor." She denied suicidal or homicidal ideation. Her affect was downcast and her mood appeared depressed.

At 6:00 pm Plaintiff was given Tylenol and Motrin for her headache with partial relief. She denied any harmful thoughts (R. 650). At 10:00 pm she had no complaint of headache. She slept through the night.

The next day (August 1, 2002), Plaintiff was given Motrin at noon and Percocet three hours later for migraine (R. 648). She was also prescribed Phenergan for nausea/vomiting, and Imitrex for migraine.[9]

The next day (August 2, 2002), Plaintiff's Percocet was discontinued (R. 647). She received Phenergan and Imitrex for migraine. She complained of mild headache. She maintained good eye contact. It was noted that she was out in the "unit," where she was pleasant in her interactions with

---

[9]Again the undersigned notes Plaintiff had previously reported to various doctors and hospital personnel that she could not take Imitrex because it caused "panic attacks."

the staff and peers (R. 629). She reported starting to feel better in the last three days. She denied any suicidal or homicidal thoughts or feelings. Her appetite was fair and she ate 75% of her breakfast. She reported vomiting after breakfast, although no vomit was noted by staff. One and a half hours later, Plaintiff was lying on the floor complaining of headache and vertigo (R. 639). *She reported she did not pass out but "just layed [sic] here because my head hurts so bad."* (Emphasis added). She was assisted to her bed and given Motrin for pain.

Later that day *Plaintiff told her psychiatrist she had fallen earlier as she "passed out with headache"* (R. 638) (Emphasis added). She said she had had "such spells" in the past. She said the only thing that helped her headaches was "Butalbital." She denied any psychiatric symptoms. The psychiatrist called the "Family Medicine" and "Supportive Therapy" Departments for consults. Plaintiff had had a CT scan which was negative. She had responded to Demerol the day before, but the psychiatrist was reluctant to prescribe too many narcotics, and asked a "Family Medicine" physician to advise him on the issue.

Plaintiff was seen by Dr. Heather Straight later that same day for her complaints of headache and vomiting (R. 636). Plaintiff reported a history of migraine headache being treated by neurologist Dr. Azzouz in Fairmont. She did not mention Dr. Morris. She reported taking Esgic Plus for the headaches, but not the other medications. The latest headache had started three days earlier. She went to WVU hospital and had a lumbar puncture that was negative. They gave her Nubain and Phenergan there, which helped for a short while only. She reported vomiting that day, although it was noted she ate breakfast and lunch with no problem. Dr. Straight noted that Plaintiff's husband reported that Plaintiff "will go to multiple doctors for narcotics for her [headache]."

Dr. Straight diagnosed headache and vomiting, and informed Plaintiff she would offer her

Imitrex and Phenergan. She explained to Plaintiff that she would not prescribe narcotics for her headaches. Further, she did not recommend Percocet for migraines and discontinued that also.

On August 3, 2002, Plaintiff was seen by another doctor for evaluation of chronic headache (R. 646). The doctor noted Plaintiff would "frequently receive narcotics shots from various doctors' offices." She currently reported having a headache. The doctor offered her various non-narcotic treatments. On physical exam, Plaintiff was alert and neurologically intact. The doctor assessed chronic cephalgia/migraine headache and suspected polysubstance abuse. She was to refrain from using any narcotics.

At about 11:00 a.m. that same day, it was noted that Plaintiff was calm, pleasant and cooperative (R. 641). She complained of headache and denied relief from the non-narcotic medications. She also complained of nausea and indicated the headache was due to her hormone patch. She asked for "butalbital" (quotes in original) but cooperated with pain management as ordered. Later she showed a dysphoric mood, appeared depressed, and held her head due to headache.

That same day at noon, Dr. Cuchua spoke with Plaintiff about narcotic withdrawal and headaches (R. 645). He told her narcotics were contra-indicated for her headaches and that she "would not get them." Plaintiff asked to see a neurologist, but was told the neurologist was off for the weekend. Plaintiff responded: "I won't be in here longer than Sunday." Dr. Cuchua gave her Phenergan for nausea and Motrin for her headache, and noted there was "Likely to be narcotic w[ith]/d[rawal]."

At about 4:00 pm that same day Plaintiff complained of "migraine" (quotes in original), "but refused [the] meds" that were offered (R. 645). She was being monitored for symptoms of opiate

withdrawal. Her affect was restricted and her mood was even. She was given an injection of Phenergan for complaints of nausea.

Plaintiff was examined by a psychiatrist that morning, and was reexamined again in the afternoon "at her request" (R. 645). She stated that she was feeling nauseous and vomited, but the psychiatrist noted she had refused Phenergan (offered for nausea) that morning. He noted she was then seen by "family medicine regarding her headaches," who affirmed that Plaintiff "has an addiction problem." In the afternoon Plaintiff stated she felt better and was not feeling nauseous. She denied any suicidal or homicidal ideation. Her affect was blunt and she remained preoccupied about her headaches.

That same evening it was reported that Plaintiff had spent most of the day in her room complaining of headache and "feeling bad" (R. 644). She reported nausea and throwing up. Her affect was downcast and her mood was depressed. She denied suicidal or homicidal ideation. At therapy that same evening, Plaintiff's affect was constricted and her mood was improved (R. 640). She had no suicidal or homicidal ideation, intent or plan. She appeared anxious about her current symptoms and wanted to know what might cause them. She described audio/visual and tactile hallucinations. She reported depressed mood and low energy, but feeling agitated with racing thoughts. She reported spending sprees that she remembered, but also buying things like jewelry and a dog that she did not remember buying. She discussed nightmares regarding the rape. The therapist told her these symptoms were common to trauma survivors, and were part of depression. They discussed relaxation and breathing techniques to help with anxiety and flashbacks.

Later that same evening, Plaintiff was lying on the couch in the lounge watching television (R. 644). She was complaining of headache. Her affect was blunted. She requested medication

early and then went to bed. She had removed her hormone patch because she said she had been having worse headaches since using it (R. 643).

The next day (August 4, 2002), Plaintiff was up on the unit interacting with the staff and peers (R. 643). Her affect was restricted, her mood dysphoric. She appeared angry for the most part with relatively poor eye contact. She denied any suicidal or homicidal ideation and/or psychosis. There were no symptoms of any of these noted or present. She had no current complaints or problems. Her affect was still restricted and her mood even.

Later that same day, Plaintiff actively participated in her group therapy (R. 643). She reported decreased headache since removing her hormone patch.

Plaintiff was discharged that same day (August 4, 2002).

At the Administrative Hearing four days later, on August 8, 2002, Plaintiff testified she had been a produce manager for a grocery store and department manager for a grocery store and then managed a convenience store (R. 737-738). Plaintiff testified she stopped working in January 2001, due to her PTSD and panic attacks (R. 742). She had been diagnosed with PTSD five years earlier, but said *late 2000 was when the panic attacks "really began," and the flashbacks "were so severe."* (Emphasis added). Stress seemed to trigger the attacks. *She testified she began having the panic attacks and flashbacks when she saw the person who had raped her at age 15.* When she stopped working she was experiencing flashbacks "pretty often . . . like maybe six, seven flashbacks a day, maybe more." She was also having a couple of panic attacks per day, more when she was at work. They would last anywhere from 15 minutes to an hour, depending on their cause. When asked how the attacks interfered with her ability to work, Plaintiff testified:

> I wasn't able to do my job to the best of my ability. It was, you know,
> I had to do all of the paperwork and the ordering, and things like that.

41

> And it was just interfering. I'd have crying spells, you know. I had
> to do the bank work, do all of that, and it was just interfering.

(R. 744). Plaintiff testified the frequency and intensity of her flashbacks had gotten worse since that time. She testified:

> They've caused my headaches to have bad migraines with them now.
> And I have at least one panic attack a day, and I'm on medication for
> that. It just - - the main thing is when I get upset and everything, I
> end up with a migraine.

(R. 744). She said she had had "some" migraines before she stopped working, but they "weren't as bad." She had them after the birth of her first son, but only once every month or two. They started to increase in frequency after she started having the flashbacks. She described the migraines as "a stabbing, throbbing, unbearable pain" that caused her stomach to be upset and caused a lot of vomiting. She could not stand lights, sounds or smells, and became dehydrated. She would try to "suffer them out." If they did not go away, she would go to Dr. Morris who would work on her neck to release the muscles and give her a Nubain and Phenergan shot. The shot "sometimes" helped, but usually took a couple of hours. The thing that helped most was rest. After getting the shot, she would go home and try to sleep the migraine off. The migraines could last from an hour to three or four days. She had had one that lasted 40 days, when she finally went to the hospital. She currently had a couple of migraines per week.

Plaintiff also testified she suffered from depression (R. 747). She cried, did not want to cook and clean, and did just "the bare minimum of what [she] had to do."

Plaintiff testified she had been hospitalized three times, the first when she tried to commit suicide in 1998, the second when she had dreams of killing her rapist, and the third only a week before the hearing, also for dreams of killing the rapist (R. 753). She was having a lot of panic

attacks and was feeling hopeless. She "couldn't do [her] daily chores" and was just "very depressed."

Plaintiff testified that when she was stressed or having flashbacks and nightmares, "another personality will come out" (R. 748). She said she admitted herself to the hospital once as "Tommy Snodgrass." She also had times during which she would not remember days at a time. She had these "blackouts" every couple of months or so. She would be aware it had it happened because she would have purchased something that she did not remember buying. She bought jewelry, two dogs, and even a car during these blackout periods. When asked how she paid for the car, she testified she took out a loan. When asked what name she signed to get the loan, Plaintiff testified: "I'm assuming Vanessa. I mean, I - - I never thought about that" (R. 749). She testified she had just recently had one of these spells, where she woke up her husband and told him, "Vanessa needed help" (R. 750).

Plaintiff testified she was taking Seroquel and Risperdal for her blackout spells and for sleep, Inderal for migraines, and Klonopin for panic attacks. Her anti-psychotic medications were just starting to help. They were helping her sleep. *The only side effect she had from her medications was weight gain*. She saw Dr. Morris two to three times a week for her migraines, getting a shot or a manipulation of her neck each time.

Plaintiff testified she drove about seven miles per day, going either to the grocery store or to visit her grandmother (R. 740). She had two young sons, and cared for them "the best [she] can." Her grandmother helped care for them. She testified she woke up around 7:30 in the morning and watched television while she waited for her boys to wake up. Then she did "just the bare minimum of what [she had] to do to get by." She watched "a good bit" of television. She did the grocery shopping. She testified that her house was "a disaster right now" and that it was all she could do to

clean her house. She cooked only what she had to for her boys. When she had a migraine, she still was able to fix them meals because she would make herself do it. When the boys were gone for school, she would do "anything to not be in the house, to be out, you know, so I'm not alone." When she would have a migraine and get a shot, she would often go to her grandmother's house and rest while her grandmother watched the boys. When asked if she did laundry, she testified: "Yes. I do what I have to do." Socially she just mainly visited her grandmother and mother (R. 752). She tried to avoid crowds.

Plaintiff testified her older son played ball and she attended all of his games (R. 755). Even when she had a headache she would "try not to let [her] headaches interfere with [her] children's activities." She also had a friend she visited.

Plaintiff also testified she had "a lot of memory loss" (R. 752). Her husband would tell her to do something "day after day" and she would forget. She would even forget he told her to do it.

Near the end of the hearing, the ALJ asked Plaintiff:

Q:     What's different, Ms. Snodgrass, about January of '01, and today? How could you work as
        a manager in a busy store and supervise people, compared to what you're telling me today"
        What's different, and how did it become different, would you say?

A:     The man that raped me, he would come into the store where I worked.

Q:     The convenience store?

A:     When I was at Middletown Shop and Save, he would come into the bank where I was at - -
        where I was working. There was a bank inside the store. And I would see him. And then
        the convenience store that I worked at, he would - - he'd come in there.

(R. 759).

44

The ALJ asked the VE if any jobs would be available in the national or regional economy for a hypothetical individual with Plaintiff's educational and work experience with no exertional limitations, but the following non-exertional limitations: unskilled, low-stress work, defined as one and two-step processes, routine and repetitive tasks, primarily working with things, rather than people, entry level, with no hazards such as dangerous and moving machinery or unprotected heights (R. 760). The ALJ testified there would be a significant number of jobs available to an individual with those limitations. If the person missed more than two days a month consistently, it would be a problem, however.

After the hearing, the ALJ referred Plaintiff for a neuropsychological screening, performed by Thomas Andrews, Ph.D. on September 18, 2002 (R. 697). Plaintiff drove herself the 50 miles to the appointment.

Upon mental status examination Plaintiff appeared a slight bit anxious but very cooperative (R. 699). She laughed appropriately. Her attitude was pleasant and cheerful. She seemed to try her very best. Eye contact was normal and length and depth of verbal responses were normal. Sense of humor and ability to carry on a conversation were normal. She related in a normal manner. Production, pace, and tone of speech were normal and awareness of time, person and place were normal. Her primary mood was normal. Her affect appeared to be broad normal. Ideational output appeared normal. Thought content was normal. She reported her perceptual functioning as:

> I hallucinate. I hear things. It's like I have another personality that comes out. It's made me check myself in to the hospital as a Tommy Snodgrass but I didn't know it. There are times when I go two or three days that I don't know what I did.

Insight was good. Judgment was average. There were no significant signs of risk to self or others. Immediate memory was normal. Recent memory was normal. Remote memory was normal.

45

Concentration was within normal limits (R. 702). Cognitive functioning was "quite normal."

Plaintiff reported her daily activities as follows:

> I get up at 3:00 in the morning and just lay on the couch until the kids get up. Then I watch TV. I get the kids ready for school then I start a little laundry. I always feel anxious that I don't know what to do so that I could only focus on one thing at a time Like watching TV. I'll start dinner for the boys, then I feed the boys. I help them with their homework. I get the boys to bed and ready for bed. My husband []and we [sic] spend time together and I go to bed about 11:00.

(R. 702). She reported performing the following activities: grooming daily, cooking daily, cleaning weekly, laundering daily, shopping weekly, driving weekly, walking monthly, exercising weekly, watching TV daily, and listening to the radio weekly. Plaintiff described her social functioning as essentially constricted, just visiting with friends or relatives. During the evaluation she socially interacted with Dr. Andrews and his staff members in a manner he described as within normal limits. *Her concentration was within normal limits. Her persistence was within normal limits. Her pace was within normal limits. Her memory was within normal limits*. Dr. Andrews opined Plaintiff would be able to manage her own benefits.

Dr. Andrews diagnosed PTSD on self-report, and Panic disorder with depressive overlays and depersonalization/derealization features. He found her prognosis good (R. 702).

Dr. Andrews completed a mental RFC, opining Plaintiff would have, at most, slight limitations on her abilities to do work-related activities (R. 704-705).

The ALJ also referred Plaintiff for a psychiatric evaluation by Paul Clausell, M.D. on October 16, 2002 (R. 712). Plaintiff had driven herself and a friend the 50 miles to the appointment. Her grooming was fair and her attitude and cooperation were good. On mental status examination Plaintiff was alert and fully oriented (R. 714). She frequently asked that questions be repeated, but

was not easily distracted. She said her mood was good when her family was home but she became upset and had trouble functioning when alone. Her affect was broad. Her speech was relevant, coherent, spontaneous, and had a normal rate. She comprehended without difficulty. Her concentration was good. She could repeat five digits forward and four backward. She had mild difficulty with serial seven's, subtracting five times and making one error. Her immediate recall, retention, and recent memory were good. Remote memory was poor to fair. Thought form was negative for flight of ideas, circumstantiality, tangentiality, preservation, loose associations or blocking. Thought content was negative for delusions, obsessions, compulsions, and suicidal or homicidal ideation.

Dr. Clausell opined Plaintiff would have difficulty managing finances due to her spending habits, "especially in the Tommy alter" (R. 715). He noted that at home, "her husband manage[d] all their finances and everything is in his name." Dr. Clausell diagnosed PTSD, chronic; Panic Disorder; and Major Depression, Recurrent, Mild (R. 715). He assessed her GAF as 63.[10] He noted that psychological testing would be of benefit "*in helping to determine if there is exaggeration*." (Emphasis added).

Dr. Clausell also completed a Mental RFC, opining that Plaintiff would have, at most, slight limitations on her ability to do work-related activities, except "during attacks/flashbacks," when she would have a marked limitation in almost every area (R. 716-717). He noted:

> Her panic attacks and separate flashbacks interfere with her ability to perform. Memory is affected as is decision making during these

---

[10]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

> episodes. If she is not experiencing these then she can function more
> normally.

and

> If patient does not experience a flashback or a panic attack she can
> respond appropriately but when she does experience these it becomes
> necessary to withdraw from public and get off to herself until event
> is over – up to 30 minutes several times [per] day.

(R. 717).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability
    and Disability Insurance Benefits set forth in Section 216(i) of the Social
    Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged
    onset of disability.

3.  The claimant has major depressive disorder, recurrent, posttraumatic stress
    disorder, panic disorder, personality disorder, not otherwise specified, and
    unspecified migraine (general), impairments considered "severe" based on
    the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal
    one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are
    not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the
    record regarding the severity of the claimant's impairments (20 CFR 11
    404.1527 and 416.927).

7.  The claimant has the following residual functional capacity: she is able to
    perform the physical demands of work at all exertional levels. She must
    avoid hazards, such as dangerous or moving machinery or heights. She is
    limited to unskilled, low stress, entry-level work that involves one-to-two-
    step work processes and routine, repetitive tasks, primarily working with

48

things rather than people.

8. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

11. The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12. Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age, education and work experience, she could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as stocker and hotel maid.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

14. The claimant has no exertional limitations (20 CFR §§ 404.1545 and 416.945).

(R. 25-26).

## IV. Contentions

A. Plaintiff contends:

 1. The ALJ's finding that the record fails to establish a basis for the frequency and severity of her headaches is not supported by substantial evidence and

 2. The ALJ's finding that the severity of her mental distress is not credible is improper and unsupported by substantial evidence.

B. Defendant contends:

 1. The ALJ properly considered Plaintiff's impairments in determining that she was not disabled.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Credibility and Mental Impairments

Plaintiff argues the ALJ's finding that the severity of her mental distress is not credible is improper and unsupported by substantial evidence. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

Social Security Ruling ("SSR") 96-7p provides some of the factors the ALJ should consider when assessing credibility:

> Assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:
>
> The medical signs and laboratory findings;
>
> Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and
>
> Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

20 CFR 404.1520a provides additional guidance for evaluation of mental impairments:

> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

A review of the ALJ's decision indicates he followed the required technique in evaluating Plaintiff's alleged mental impairments. He found Plaintiff had only mild limitations in activities of daily living; a moderate limitation in social functioning; a moderate limitation in concentration,

persistence or pace; and had a history of one or two episodes of decompensation during the period in question (R. 21-22). These limitations are supported by the record, particularly the evaluation of Dr. Andrews, who opined Plaintiff's social interaction, concentration, persistence, and pace, and memory were all within normal limits.

The ALJ noted Plaintiff received "varying diagnoses by the numerous evaluators" (R. 21). He found the record established she had PTSD, a related panic disorder, and a major depressive disorder. He found these mental impairments were severe. He also found, however, that the record failed to support Plaintiff's claims and diagnoses of psychotic features, schizoaffective disorder, and dissociative disorder.

The Fourth Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson*, 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

Plaintiff was treated by Valley Mental Health beginning February 2001 (R. 183). She was diagnosed with PTSD, Rule out Obsessive Compulsive Disorder, and a Personality Disorder NOS (Axis II). By March 2001, she was diagnosed with PTSD and Rule Out Dysthymia, with Personality Disorder NOS at Axis II (R. 179). By June 29, 2001, she was diagnosed with PTSD and Personality Disorder NOS (at Axis II) (R. 173). Plaintiff was first diagnosed with "Rule out Major Depression

with Psychotic Features" by Dr. Mehendru on October 1, 2001 (R. 474). He assessed her GAF as 25. He decided to discontinue Wellbutrin "because it was recently started and the patient has started to have recent auditory hallucinations." Only two days later, however, he expressly determined she was not psychotic and assessed her GAF as 50. Plaintiff's diagnosis at Valley remained unchanged (PTSD, rule out dysthymia, with personality disorder NOS) through December 3, 2001. By her next appointment, on March 5, 2002, however, Plaintiff reported she was having hallucinations, including feeling spiders crawling on her, seeing "things and shadows that run by" and hearing "chatter of voices" (R. 396). She was then diagnosed with MDD – recurrent with psychotic features, PTSD and Rule Out Bipolar Affective Disorder. When Plaintiff presented to WVU in July 2002, however, she reported no hallucinations, paranoia or delusions (R. 606). She was diagnosed with PTSD and Dissociative disorder, provisional. This is the first diagnosis of dissociative disorder in the record. Upon her evaluation at UHC a few days later, she reported a "history of schizoaffective disorder" (R. 631), although the undersigned found no diagnosis of schizoaffective disorder prior to that time. The only earlier mention of schizoaffective disorder in the record was where Dr. Mehendru pointedly noted that Plaintiff tried to find out from him about the disorder. He did not diagnose it. Dr. Salman diagnosed schizoaffective disorder as well as dissociative disorder on August 1, 2002, after Plaintiff reported having a history of the disorders (R. 231).

Approximately one month later, after extensive testing, Dr. Andrews diagnosed PTSD on self-report and panic disorder with depressive overlays and depersonalization/derealization features (R. 701). Shortly thereafter, although Plaintiff reported the hallucinations to Dr. Clausell, he diagnosed only PTSD, Panic Disorder, and Major Depression, Recurrent, Mild (R. 715).

It is the ALJ's duty to resolve these conflicts in the evidence. The undersigned finds

substantial evidence supports the ALJ's determination that the record did not support Plaintiff's allegations of psychotic features, schizoaffective disorder or dissociative disorder.

Additionally, Plaintiff's own descriptions of her daily activities substantially support the ALJ's determination regarding her functional limitations. Despite the long history of symptoms of migraine and mental impairments, Plaintiff worked until January 2001. She was a department manager in a large grocery store from June 1998 until October 2000, and then was the manager of a convenience store from October 2000 until she quit in January 2001. She testified the one thing that changed in January 2001, that caused her to have to quit working, was that the man who raped her would come into the store where she worked. Yet she told Dr. McFadden *in December 1998*, that she was "quite angry" with the rapist because he would come into the store where she worked (R. 170). On March 10, 2001, after she quit working, Plaintiff stated she was "a mother for 2 little boys" who depended on her for care (R. 84). She said she had trouble sleeping at night, but that this was not a change since her condition began. She did not nap during the day. She needed no help with personal needs. She made breakfast, lunch and dinner (consisting of full-course meals) for herself and her children. Her daily activities included laundry, vacuuming, dusting, paying bills, mopping, washing dishes, managing bank accounts, running errands, and taking out the trash (R. 85). She had no assistance with any household chores. She shopped for food, clothing and medication about twice a week, driving herself. She read magazines and books and watched television. She visited her mother every month or so. Sometimes she picked her children up from school.

On August 22, 2001, Plaintiff underwent a total hysterectomy and was discharged two days later with instructions to have two quiet weeks at home before going out at all. On August 26, however, she "had gone shopping for school supplies with her children." She told the nurse the day

54

after that "she has two children at home, ages 6 and 8 and she really needed to take care of them and the house and had basically overdone it."

On October 5, 2001, Plaintiff's husband told Dr. Mehendru that "she takes very good care of her two children. She is very much involved in their activities and their school."

On October 7, 2001, Plaintiff told Dr. Damm she typically got up at 6:00 a.m. to get her children ready for school. After they'd gone she did household chores such as cleaning or laundry. When the children returned home, she tried to help them with their homework. She fixed dinner and then sat and read books with her children. They usually went to bed around 8:00 p.m., then she spent time with her new husband (she married about four months earlier). She enjoyed riding bikes and going swimming. She had a couple of friends she might see during the week.

At the administrative hearing Plaintiff testified she drove about seven miles per day, going either to the grocery store or to visit her grandmother (R. 740). She cared for her two young sons "the best [she] can." Her grandmother helped care for them. She would get up around 7:30 in the morning and watch television while she waited for her boys to wake up. Then she did "just the bare minimum of what [she had] to do to get by." She watched a good bit of tv. She did the grocery shopping. Even when she had a migraine, she still was able to fix her family meals because she made herself do it. When her sons were gone for school, she did "anything to not be in the house, to be out, you know, so I'm not alone." When asked if she did laundry, she testified: "Yes. I do what I have to do." Socially she just mainly visited her grandmother and mother and tried to avoid crowds. Yet she attended all of her son's ball games (R. 755). Even when she had a headache she would "try not to let [her] headaches interfere with [her] children's activities." She also had a friend she visited.

55

About one month after the hearing, Plaintiff told Dr. Andrews:

> I get up at 3:00 in the morning and just lay on the couch until the kids
> get up. Then I watch TV. I get the kids ready for school then I start
> a little laundry. I always feel anxious that I don't know what to do so
> that I could only focus on one thing at a time Like watching TV. I'll
> start dinner for the boys, then I feed the boys. I help them with their
> homework. I get the boys to bed and ready for bed. My husband
> []and we [sic] spend time together and I go to bed about 11:00.

Plaintiff had driven the 50 miles to each of the consultative examinations herself.

The ALJ also noted reports that indicated Plaintiff's symptoms were either not credible at

all or were, at least, exaggerated. In particular, he noted Dr. Mehendru's report of October 2001,

regarding what he was told by Plaintiff's husband and sister. Both family members told him Plaintiff

had a "knack" for finding out other people's mental symptoms "and making their symptoms her

own." Plaintiff argues the ALJ misinterpreted this report. The undersigned does not agree. Dr.

Mehendru noted as an example, that Plaintiff "met somebody who had a history of panic disorder

with agoraphobia and after that, she started saying that she is afraid of being in crowded places."

He also noted she was trying to learn about her sister's bipolar disorder symptoms and "trying to

make them her own." Finally, he noted Plaintiff was "trying to ask" him about schizophrenia,

schizoaffective disorder, and bipolar disorder. The undersigned finds the ALJ's interpretation of this

report as undermining Plaintiff's credibility is reasonable. It is supported by Dr. Mehendru's

statements in the same report that "the voices could have been, *if present*, Wellbutrin induced," and

"*I also would rule out the possibility of malingering*." (Emphasis added). Further, although on

admission Dr. Mehendru diagnosed PTSD and Rule out Major Depression with psychotic features,

after this report he concluded: "Diagnostically, I think, at this time, she has post-traumatic stress

disorder and panic disorder." Although on admission Dr. Mehendru assessed Plaintiff's GAF as

56

25, on discharge only two days later, he assessed it as 50. He expressly found she was not depressed, not suicidal, not homicidal, and not psychotic, and found she was stable psychiatrically to be discharged home. He prescribed only Paxil, Trazodone for sleep and Klonopin for anxiety (R. 465).

All of the above substantially supports the ALJ's interpretation of Dr. Mehendru's report.

Pursuant to 96-7p, the ALJ is also to consider inconsistencies in the claimant's statements, especially, to medical providers, as follows:

> The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

Additional support for the ALJ's determination regarding Plaintiff's credibility is found in

inconsistent statements Plaintiff made to her medical providers.

In 1998, Plaintiff told Dr. McFadden that she and her boyfriend of four years were separating because "the headaches are essentially to much for [him] to bear." In 1999, she told Dr. Yemeni she was having trouble with her five-year relationship because her boyfriend did not want to get married. On June 2, 2000, Plaintiff told Dr. Tinnin she was "not capable of loving/dating one guy for six months." On July 7, 2000, Plaintiff told her providers that *recent* stressors were "that the father of her 5 yr. old has been back in her life and she was hoping for marriage but he recently told her he is not ready for that commitment." Less than two weeks later she told Dr. Tinnin that she and her long-time boyfriend had broken up nine months earlier because he "couldn't take it anymore with my headaches."

On June 5, 2001, Plaintiff presented to the ER for migraine headache (R. 545). She was offered Imitrex, but refused it, saying it caused her to have panic attacks. She refused Phenergan saying it did not work. She refused DepoMedrol, stating she had gotten a shot on Wednesday. She said she was unable to take other medications due to nausea, but the attending physician noted she refused to take Phenergan (used for nausea). The undersigned could find no support for any of Plaintiff's claims regarding medications in the record. To the contrary, she received Phenergan regularly throughout the relevant period, and was given Imitrex by different providers on various occasions with no side effects noted. In fact, on October 7, 2001, Plaintiff told Dr. Damm that Imitrex helped her migraines. One month later, however, she again refused Imitrex at the ER, again saying it gave her panic attacks.

On several occasions, Plaintiff told her mental health providers that her childhood had been traumatic because her father was a deputy sheriff and they often had to move to safe houses because

58

of threats and danger. She told Dr. Tinnin, however, that "she felt safe as a kid because [her] father was the Deputy Sheriff in our town."

Plaintiff told Dr. McFadden in 1998 that the rapist made her very angry because he came into the store where she worked. Yet at the administrative hearing, she testified the one thing that changed to make her have to quit work in 2001, was that the rapist was coming into the store where she worked.

Plaintiff's therapist noted in his records that Plaintiff's doctors' office had called him, saying that Plaintiff had told them he (the therapist) had recommended a pain shot. He had not recommended a pain shot.

Another inconsistency in the record is found in the treatment Plaintiff sought for relief of her symptoms. On many occasions, Plaintiff complained of pain, *"but refused [non-narcotic] meds" offered* (R. 645) (Emphasis added). At times she told providers the non-narcotic medications did not work or even caused panic attacks. There is no support for these claims in the record.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not totally credible, as well as his conclusions regarding Plaintiff's mental impairments.

## B. Migraine Headaches

Plaintiff also argues that the ALJ's finding that the record failed to establish a basis for the frequency and severity of her headaches is not supported by substantial evidence. The undersigned has already found that the ALJ's conclusion that Plaintiff was not entirely credible is supported by substantial evidence. Plaintiff, however, argues that "the record establishes that Vanessa went to the doctor or emergency room for her headaches, and the physicians believed that her headaches were

severe enough to give her injections of Phenergan and Nubain a total of 37 times in 2000 and 52 times in 2001." First, as already discussed, Plaintiff worked as a department manager and then as a store manager throughout 2000. Second, there was really only one physician's office providing the vast majority of the injections – Dr. Morris.' That he may have believed her headaches were severe is not dispositive of the issue. Other doctors expressly refused to provide her narcotics, some even opining they were contra-indicated for headaches. Plaintiff also argues her physicians "treated her headaches with narcotic pain medication and anti-nausea medication at a frequency that would disable her." There is no support in the record for this claim, however.

Significantly, Plaintiff complained of migraines for many years but continued working during that time. She received injections of narcotics 38 times in the year 2000, and also worked that entire year as a grocery store manager. During that time she was doing the paperwork and banking and other management tasks. An ability to work with an impairment is inconsistent with that impairment being disabling. See, e.g., Cauthen v. Finch, 426 F.2d 891(4th Cir. 1970). Also significantly, Plaintiff had had only two injections of narcotics in the month before she quit working, and none the month after she quit. As already discussed, Plaintiff's claim that her symptoms forced her to quit working when the rapist started coming in the store where she worked is belied by the fact that she had told a psychiatrist he was coming in the store at least 2 ½ years prior to her quitting. During those 2 ½ years, she managed a department in a large grocery store, and then became a convenience store manager.

The record does support an increase in the amount of narcotics Plaintiff received from doctors, particularly Dr. Morris, after she quit working. The issue is whether the number of visits to doctors and the amount of narcotics they gave her support her allegations of disabling migraines.

60

The ALJ found they do not. As the ALJ noted, all of Plaintiff's examinations, laboratory work, and studies, including CT scans of her head, MRI's, EEG's, and lumbar punctures, were normal. There is, in fact, no objective evidence of severe migraines in the record. In addition, as already discussed, Plaintiff's own reported activities were inconsistent with her allegations of disabling frequency and severity of her symptoms. The ALJ's credibility finding is supported by substantial evidence. The fact that Dr. Morris' office gave her narcotics on a regular basis, while supporting a finding that Dr. Morris believed Plaintiff's complaints of frequent headache pain, does not necessarily support a conclusion that she actually had disabling pain, in light of other evidence to the contrary. The evidence, as noted above, supports a finding that Plaintiff was not credible.

As previously noted, the record is replete with evidence that, notwithstanding Plaintiff's subjective complaints of headache pain and the treatments received based on those subjective complaints, she continued to function at the grocery store until she voluntarily quit that job at or about the time she filed for disability benefits, and that she continued to function with respect to substantial daily activities past the date of the hearing. No doctor ever opined she was disabled.

Plaintiff never claimed at the administrative level that she was disabled due to the medical treatment prescribed by her treating physicians. The only allusion to that is Plaintiff's counsel's argument made for the first time in her brief to this Court to the effect that Plaintiff's physicians "treated her with narcotic pain medication and anti-nausea medication at a frequency that would disable her." Such an argument ignores the substantial evidence in the record that the ALJ considered in concluding that Plaintiff's allegations of inability to work were contradicted by her actual work and daily activities. There is not substantial credible evidence in the record that would support a conclusion that the prescribed treatments themselves disabled Plaintiff. Plaintiff

consistently reported, and her doctors consistently found her medications caused no side effects. Even at the hearing, she testified the only side effect she had was weight gain. She worked full time and cared for her two small boys while taking those same medications. She was not fired or laid off from her management position, but quit. Further, the State agency reviewing physician ( a Medical Doctor) expressly noted Plaintiff's "long history of treatment for migraines, including 44 doctor visits where she received Nubain and Phenergan within less than a year," yet opined that Plaintiff was capable of performing work (R. 381).

Plaintiff's counsel artfully attempts to prove disability by arguing that the "narcotic pain medication and anti-nausea medication" was prescribed "at a frequency that would disable her." If counsel is alluding that a basis for disability would be "addiction to narcotic drugs," that argument would fail because the evidence in the record before the ALJ is insufficient to draw that conclusion. There is scant evidence and no diagnosis of addiction in the record.[11]

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled.

## VI.  RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's applications for SSI and DIB.   I accordingly recommend that Defendant's Motion for Summary Judgment [D.E. 12] be **GRANTED,** that Plaintiff's Motion for Summary Judgment [D.E. 11] be **DENIED,**  and that this matter be dismissed from the Court's docket.

---

[11]If Plaintiff had been determined to be disabled, and then if a narcotics addiction were determined to be a contributing factor material to the determination of that disability, pursuant to § 404.1536, Plaintiff would be required to undergo treatment for that addiction and make progress in that treatment in order to obtain benefits.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.


Respectfully submitted this __11__ day of January, 2006.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

63